# PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT
# OF EVAN HENDRICKS

I, Evan Hendricks, provide the following Expert Report in connection with the action entitled <u>Andrew Powers II v. Equifax Information Services & Capital One Bank, et al</u>: U.S. District Court for the Eastern District of Virginia (3:12-cv-369).

**Part 1** of this report addresses issues that are specific to this case, including a context and history that robustly put Defendants Experian and Capital One on notice of the problems in this case and why Defendants should have prevented them. **Part 2** includes my qualifications, list of prior cases in which I have testified, my fee, and more general opinions, such as the nature and purpose of credit scores and credit reports, and damages. If appropriate, and if justified by the production of additional evidence in discovery, I reserve the right to supplement this report at a future date.

## OVERVIEW

I have been retained by Plaintiff's counsel to give expert opinion on the adequacy of Defendants Capital One's ("Cap One" or "Defendant") practices and procedures and its performance in Plaintiff's case.

I have also been retained to provide expert testimony on the harms that victims of chronic credit report inaccuracy typically endure, and the impact on Plaintiff of Experian's and Cap One's actions, and whether Plaintiff's damages were consistent with those harms, as well as expert opinion to put this case in its proper context, which includes Experian's and Cap One's credit reporting-related history, and the nature and purpose of credit scores and credit reports.

A preeminent goal of the Fair Credit Reporting Act (FCRA) is ensuring the accuracy and privacy of consumers' information. Congress created a strong enforcement scheme, including a private right of action and attorney's fees, so creditors ("furnishers") like Cap One and would have an incentive to give due regard to ensuring accuracy and adequately investigating consumers' disputes and protecting and respecting the privacy of consumer information.

I have been retained several times as an expert witness for plaintiffs in several cases in which Cap One was sued over allegations that it violated its fundamental duty under the FCRA to conduct reasonable investigations. Accordingly, I am quite familiar with Cap One's practices and procedures, and how it responds to compelling evidence of its consistent failures to live up to its duties, including reasonably and/or adequately investigating disputes.

A constant theme running through this and the other cases is that Cap One failed to conduct reasonable investigations of consumer disputes, and thus, failed its duty to facilitate the removal of grossly inaccurate and damaging data that Cap One was furnishing by instructing CRAs to remove inaccurate and damaging data until after Cap One was sued in federal court. In this case, as in each of these cases, the inaccurate data were damaging to the innocent consumer.

Much like the previous cases, this case illustrates that Cap One has continued too many of the systematic practices and failures that caused and perpetuate chronic inaccuracy. Moreover, a review of the facts and circumstances in this case, coupled with my knowledge of the relevant history, leads me to the opinion that Cap One still has no intention of changing these problematic practices or curing the failures -- despite the fact that Plaintiff's experience as a victim of chronic inaccuracy was eerily similar to that of his predecessors.

Thus, unless something causes Cap One to change its approach, it will continue to inflict chronic inaccuracy on consumers and ensure that others will suffer the fate of Plaintiff and his predecessors.

## Summary of Opinions

- Cap One failed to perform its accuracy- and investigative-FCRA-related duties in regards to Plaintiff's disputes. Those duties included, but were not limited to, conducting an investigation with respect to the disputed information, reviewing all relevant information provided by the consumer reporting agency, and instructing the CRA to delete the disputed item of information after it was unable to truly verify it.

- Cap One also failed to notate Plaintiff's account as "disputed by consumer" following his direct disputes to Cap One.

- Cap One knew or should have known that inaccuracies it created and then caused to persist were damaging to a consumer like Plaintiff.

- From 1996 to the present, Cap One, was put on notice by a variety of events of the importance of credit report accuracy and its duty to conduct reasonable investigations. It also was put on notice of serious deficiencies in their standard practices and procedures for responding to consumer disputes.

- The inaccurate data stemming from the erroneous Cap One accounts remained on Plaintiff's credit report because Cap One did not exercise enough care in considering Plaintiff's disputes and because its investigations of his disputes were inadequate to determine the underlying truth. This greatly compounded the damage to Plaintiff.

- The erroneously-generated Cap One account was damaging to Plaintiff's creditworthiness.

- It is well known in our field that victims of chronic credit report inaccuracy endure a common pattern of harms. The damages suffered by Plaintiff were consistent with those experienced by other victims. In addition, Plaintiff suffered damages that were peculiar to his situation.

- Cap One had a motive for disregarding its duties and failing to restore accuracy to Plaintiff's credit file: continuing to report the erroneous debt to Plaintiff's credit file enhanced its ability to collect a debt to which it was not entitled.

**Cap One's Reckless Responses to Plaintiff's Disputes**

The main issue in Plaintiff's case was that Defendant Cap One failed to conduct a reasonable or adequate investigation after receiving his disputes.

In early December 2011, Plaintiff sent a detailed dispute letter to each of the Big Three CRAs – Equifax, Experian and Trans Union. Each of these CRAS sent Plaintiff's dispute to Cap One in the form of an "Automated Consumer Dispute Verification" (ACDV).

The ACDVs sufficiently communicated information that should have enabled Cap One to reasonably investigate and determine that Plaintiff's dispute should be honored and the inaccurate, derogatory information removed.

For example, Experian used "Code 040," advising Cap One, "Account involved in litigation. Provide or confirm complete ID and verify all account information." In addition, in the FCRA Relevant Information section, Experian further informed Cap One that, "RCVD COURT DOC CL08371 DTD 04.12.10 STATING ACCT IS IN LITIGTION [Powers 0001, 12/13/2011].

Thus, Experian made it easy for Cap One to verify that Plaintiff's dispute should have been honored by identifying the court case number.

TU used "Code 110," advising Cap One that Plaintiff "Claims company will change. Verify all account information." Unlike Experian, TU failed specify the court or case number, it did state that Plaintiff provided documentation, but stated TU was "Unable to authenticate documentation dated 09/27/2010." [Powers 0002, 1/03/2012]

Equifax used "Code 106," "Disputes present/previous Account Status/Payment History Profile, Payment Rating; Verify Payment History Profile, Account Status and Payment Rating; and "Code 107," "Disputes Special Comment/compliance Condition Code/Narrative Remarks; Verify Special Comment Compliance Condition Code, Narrative Remarks. In addition, in the FCRA Relevant Information section, Equifax further informed Cap One that, "CONSUMER SENT LETTER FROM NECTAR PROJECTS DATED September 27, 2010 STATING AS FORECLOSURE HAS BEEN SATISFIED SIGNED." [Powers 0003, 12/29/2011]

Despite all of this information provided to Cap One by the CRAs, Cap One, instead of conducting a reasonable investigation, essentially "verified" that the derogatory foreclosure status should stay. Given the context (see below), Cap One's failures reflected its reckless disregard for Plaintiff's rights, as well as its own duties, under the FCRA.

It should be noted that at the bottom of each of Cap One's response-ACDVs, the fine print stated: "When you sign this form, you certify that you have verified the accuracy of the entire item in compliance with all legal requirements and that your computer and/or manual records will be adjusted to reflect changes noted above."

**FCRA Dispute Investigations & The ACDV-Exchange**

Why Cap One's grossly inadequate responses to Plaintiff's disputes?

It is essential that the trier of fact gain an understanding of Cap One's principal method of responding to consumer disputes forwarded to it by CRAs.

The principle "reinvestigation" procedure is implemented through a system called "E-OSCAR", and essentially consists of an exchange of messages known as "Automated Consumer Dispute Verifications" (ACDVs). When the consumer sends his dispute to a CRA, the CRA populates the ACDV form with the consumers's identifying information (name, address, city-state-zip, SSN, sometimes previous address), and a two-or three-digit, or alpha-numeric code that cryptically describes the dispute (e.g., "not mine" or "fraud"). In a "not mine" dispute, the ACDV instructs the furnisher to provide "complete ID."

Upon receipt of the ACDV form, Cap One will advise the CRA if a sufficient number of identifiers (i.e., name, Social Security number) match up and then "instruct" the CRA to either delete, modify, or "verify" the information so that it remains.

Thus, this process is better described as a ***comparison*** of each entity's existing data on the consumer, rather than an independent evaluation or investigation of the consumer's dispute.

As this case illustrates, there can be several problems with a Cap One's reliance upon the ACDV-exchange serving as the principal means of responding to consumer disputes. First, a cursory exchange of messages does not amount to an investigation under any normal sense of the word. The Webster's New Collegiate Dictionary defines "investigate" as, "v. To observe or study by close examination and systematic inquiry. Systematic—adj.    Marked by thoroughness and regularity." An exchange of messages is neither a "study by close examination" nor "marked by thoroughness and regularity," in my opinion.

Second, in cases like this, where the initial erroneous furnishing of the consumer's data *is the cause* of the inaccuracy in the victim's credit report, the ACDV-exchange, which compares identifiers proved to not be reasonably calculated to successfully determine whether a consumer's dispute should be honored.

The ACDV system will be a reliable dispute system only to the extent that a creditor such as Cap One investigates within its own records. Cap One's ACDV research should include a review of all of its records and account history, especially prior communications between a consumer and the creditor.

A fundamental flaw with the process is that it focuses on a few key identifiers such as DOB, name, address, SSN, and is not designed to determine the underlying truth. In a case of erroneous furnishing like Plaintiff's, a true or reasonable investigation must be concerned with the underlying truth that comparison of identifiers cannot determine.

Third, because Cap One in this case relied exclusively on the ACDV-Exchange, it did not consider taking other reasonable investigative steps that could have been more effective for dealing with Plaintiff's disputes.

For starters, Cap One failed to "remember what it already knew." That is, Cap One knew (or should have known) on April 12, 2010 that Plaintiff's mortgage tradeline was "considered paid and satisfied on November 30, 2009, and that said Deed of Trust was proper for release." To conduct a reasonable investigation, Cap One needed to review all information in its possession that was relevant to Plaintiff's dispute. Not only did Cap One not do this, it never considered doing so, which reflected its reckless disregard for Plaintiff's rights, as well as its own duties, under the FCRA. Cap one needed to have a mechanism to ensure it remembered what it already knew before sending the ACDV back to the CRAs.

Moreover, Cap One had Plaintiff's contact information. Cap One did not hesitate to use Plaintiff's contact information to communicate with him directly at least three times in August- September 2010 when it sought to collect money (which, in fact, Plaintiff did not owe.) Cap One not only failed to use Plaintiff's contact information to reasonably investigate his dispute, it never considered doing so, which further reflected its reckless disregard for Plaintiff's rights, as well as its own duties, under the FCRA.

It should be no surprise then that I have previously been involved in cases like this one in which the result of an ACDV-exchange was Cap One wrongly claiming that inaccurate and highly damaging information should remain in the consumer's CRA file (see below).

Like other victims of chronic inaccuracy, Plaintiff's problems and inaccuracies would have persisted until litigation forced a more thoughtful review of his case.   It was only well after a lawsuit was filed that the inaccurate and highly damaging Cap One tradeline finally was deleted from his reports.

## I Have Considerable Specialized Knowledge Confirming That Cap One's Procedure For Responding To Consumer Disputes Is Restricted To ACDV-Exchange

Because I have been retained as an expert in consumer/plaintiff cases against Cap One, I have considerable specialized knowledge regarding Cap One's policies, procedures and standard practices for responding to consumer disputes. Specifically, the depositions of Sarah Cheek, Melissa Douglas, Karen Crew, Francis Steinberger, Christy Anderson, Curt McFarland, Audria Edwards, Anthony Imholte in such cases as Beck and Alabran (see below), as well as the depositions of Pamela G. Tuskey in Carol Fleischer, (see below), and Mr. Rheichwein in Soto (see below), confirm that Cap One's response to a consumer dispute sent to it by a CRA is restricted to ACDV-Exchange's comparison of its existing data, and that Cap One conducts no true investigation that comports with the term's plain meaning of the term. Given the context, which includes the previous, robust notice to Cap One of the problems with it system for responding to consumers' disputes, Cap One's failures in Plaintiff's case were unreasonable and reckless. (In addition to the critique above, a description and critique of Cap One's "investigation" procedures are included in my excerpted 2003 letter (see pages 10-13).

5

## Damaging Nature of Inaccuracies

The inaccuracies on Plaintiff's credit reports were damaging in several ways. First, the inaccurate Cap One account on Plaintiff's credit reports qualified as a major derogatory that ensured significant damage to his credit score. The more recent a derogatory tradeline, the more damaging it is to a consumer's credit score.

Second, at times the inaccurate data furnished by Cap One portrayed Plaintiff as having a debt that was at the time "past due." When this happens, it typically means that a creditor will not extend credit to applicants until they "resolve" the outstanding debt. A consumer sometimes "resolves" it by disputing it and removing it from his credit report. However, given the difficulty that this can entail, it is often easier and faster to resolve it by paying it. But Plaintiff justly refused to do this. This option was unavailable to Plaintiff.

The damage to Plaintiff caused by Cap One's unreasonable actions, and which remained because of Cap One's inadequate investigations, caused significant damage to Plaintiff's creditworthiness, and consequently, for their inability to obtain credit on more favorable terms to which he otherwise would have been entitled but for Cap One's failures.

For example, Plaintiff experienced credit denials, based upon credit reports containing the Cap One inaccuracy, from CitiFinancial Retail Services, Grand Home Furnishings, Kubota, and Payne Industrial & Farm Equip.

## 'Non-Economic' Damages

The above cited "economic" damages are easier to identify and quantify, and therefore easier for some people to understand.

In my experience, however, in the cases of victims of chronic credit report inaccuracy, the damage to one's well-being and lifestyle are often much more profound. For starters, the vast majority of Americans are very concerned about maintaining their good names, a fact that is reflected in FTC complaint statistics. People like Plaintiff who have worked hard for years to maintain their good name describe it as extremely hurtful to be portrayed by supposedly reputable, nationwide organizations as irresponsible deadbeats. But that is only the beginning of the harm.

To fully understand the nature of the damage, it is necessary to recognize the interrelationship between the "economic" and "non-economic" damage. The inaccurate tradeline set off a chain reaction that ultimately cast a dark shadow over his life. As his credit reputation was besmirched, victims of chronic inaccuracy find that opportunities once taken for granted are vanishing. Plaintiff's was a case in point.

The inaccuracies caused by Cap One damaged his credit standing, and directly and persistently interfered with any hopes he had to resume a normal life.

This assuredly impacted how Plaintiff felt about himself in particular and about life in general, as well as his interpersonal relationships. Like other victims of chronic inaccuracy, Plaintiff's plight symbolizes the nature of, and interrelationship between, "economic" and "non-economic" damage.

Now consider the impact that such an environment would have on a reasonable person's psyche, inter-personal relationships, ability to concentrate, organize and perform at work, and ability to enjoy life. Clearly, any reasonable person would be negatively impacted.

Greatly compounding the harm is the frustration, stress, and trepidation that victims such as Plaintiff endure as they are unsuccessful in their reasonable attempts to restore accuracy to their credit life. The truth was that Plaintiff's Cap One mortgage should not have been depicted as delinquent. However, a supposedly reputable institution like Cap One was effectively telling the financial services industry through the credit reporting system that Plaintiff was irresponsible with his finances. Plaintiff truthfully told Cap One he was being unfairly and inaccurately associated with derogatory data. Yet Cap One disregarded the essence of his disputes, as well the Cap One's duty to reasonably investigate them and restore accuracy.

### Potential Areas of Testimony: Damages Known & Common To Victims of Chronic Credit Report Inaccuracy

It is important that the trier of fact understands that victims of chronic credit report inaccuracy or identity theft often experience a series of several well-established and common types of negative impacts.

### Some Categories of Typical Negative Impacts of Chronic Inaccuracy

(1) Inaccurately described as not creditworthy and/or less creditworthy to third parties
(2) Improperly denied credit because of inaccurate data, or only able to obtain credit at less favorable rates
(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity
(4) Wrongfully received debt collection calls
(5) Chilled from applying for credit
(6) Sleeplessness, physical symptoms
(7) Sense of helplessness, loss of control over personal data
(8) The emotional distress stemming from, and associated, with all of the above

The following factors could be used to gauge the severity of damage within each category.

### Key Factors To Consider When Assessing Severity of Negative Impact

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

## Plaintiff's Damages Were Consistent with Other Victims
## of Credit Report Inaccuracy

Plaintiff's damages were consistent with other victims of chronic credit report inaccuracy. Their experiences touched on many of the eight categories cited above. In addition to the categories above, it is important for the trier of fact to understand that it can be very stressful not knowing everyone who may have associated you with highly derogatory credit data. Moreover, in my opinion, it can be difficult to maintain constructive personal relationships under stress.[2]   It can be difficult to perform adequately at one's job.

## Cap One Knew or Should Have Known Its Actions Would Have Negative Impact

The history of credit reporting cited below, which includes years of Congressional testimony and legislative actions, Federal and State enforcement actions, abundant media coverage and targeted books, such as mine, should have made it abundantly clear to Cap One that failing to prevent Plaintiff from becoming a victim of chronic inaccuracy would have a highly negative impact on him.

## Context

Context is extremely important in this type of case, in part because credit reporting, along with inaccuracies stemming from mixed files or misinterpretation of public records, is a long-standing and well-known problem.  An important role of experts in FCRA cases is to help the trier of fact understand the relevant context.[3]     Accordingly, I provide a brief history.   An important theme emerging from this history is that furnishers like Cap One were consistently provided notice in one form or another of the importance of ensuring the accuracy of information it reports and promptly restoring accuracy when the consumer disputes inaccuracies. This history also notified Cap One of the potential damage to consumers of both reporting erroneous information and then failing to correct it.

---

[2] In fact, the insurance industry says that stress, stemming from financial problems, can cause auto accidents, and therefore justifying its use of credit reports in setting insurance rates.

[3] Kirkpatrick v. Equifax, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; In rejecting Defendant Equifax's motion to exclude Mr. Hendricks' testimony, Judge Michael W. Mosman, ruling from the bench, stated: "As a general statement, what I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of the defendant in particular here in context, in the context of the nationwide problem of identity theft, in the context of the congressional reaction to that and other issues in the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, then that's something that's helpful to the jury." (January 18, 2005; Transcript available upon request.)

### FCRA History: Increased Attention on Role of Furnisher

The FCRA was amended in 1996 to impose duties on furnishers like Cap One and to create a private right of action for consumers when furnishers violated the new investigation requirements.

As the April 1994 House Banking Committee Report on the proposed amendments explained why, despite the consent agreements, and subsequent industry guidelines, legislation was necessary:

> "Moreover, because the industry guidelines are simply voluntary, they are unenforceable and may be changed or revoked at any time. Many of the provisions in the consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state. *Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest. Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors."* [Emphasis Added]

Thus, Cap One has been expected since 1997 to comply with the FCRA provisions that are relevant in this case.

### (1) Parade of Notice – 2003 House Testimony

During the 2003 House hearings on the FACT Act Amendments, Leonard Bennett, a consumer attorney specializing in FCRA cases who previously had sued Cap One and other furnishers over inadequate investigations, was sharply critical of Cap One's "investigations" procedures in her testimony, stating that Cap One, "confessed to a policy of automated investigations in which the consumer has almost no hope of obtaining relief. The furnishers merely proofread the form from the CRA and match it to the data within their computer's account screen." (Testimony Leonard Bennett before the Subcommittee on Financial Institutions And Consumer Credit of the Committee on Financial Services, Regarding, "Fair Credit Reporting Act: How it Functions for Consumers and the Economy;" June 4, 2003. http://financialservices.house.gov/media/pdf/0604031b.pdf)

### (2) Parade of Notice – 2003 Letter of Notice To Cap One CEO

Sometime after I became aware of Cap One's practices and procedures, I attempted to bring to its attention the problems that I foresaw for consumers in its faulty reinvestigation procedures by writing a letter to Cap One CEO Richard Fairbanks in December 2003.

I hereby provide excerpts from that letter (attached hereto as "Exhibit 1") because of their relevance to the issues in Plaintiff's case:

**Beginning of Excerpts from Hendricks' 2003 letter to Cap One**

In my opinion, the policies and practices described by the Capital One employee will fail to result in adequate reinvestigations of many legitimate consumer disputes and will cause Capital One to "verify" information that is inaccurate, or is incomplete to the extent that it would need to be corrected and/or deleted from a consumer's credit report in order to ensure fairness. These policies and practices will contribute to inaccuracy throughout the credit reporting system, and will also heighten damage to consumers by increasing the amount of time they expend, and emotional distress they endure, attempting to correct inaccuracies …

The first and most fundamental problem is that upon receiving a consumer dispute forwarded to it by a CRA, Capital One does not truly reinvestigate. Instead, Capital One conducts a ***comparison*** of information about the consumer contained in the dispute form provided by the CRA, with the information in its systems known as "Odyssey," "Beast," and "Unisys." As Capital One's Pamela G. Tuskey explained:

Mr. Lyngklip: What kinds of information do your ACDV operators have available to them through the interface of the Odyssey system?
Ms. Tuskey: Name, address, ECOA, pay history, cycle date, last date paid, statements,
action or activity on the account, late fees, past-due fees, membership fees, etc.
Mr. Lyngklip: What about original application information?
Ms. Tuskey: That, we cannot see in Unisys.
Mr. Lyngklip: All right. Is there a reason why it is that your ACDV operators do not have access to all of the other systems that I mentioned, being Tandem, CHIA, Retain One, Casper, Baltrax, Amdahl, Capstone, and Rocky?
Ms. Tuskey: Yeah, I'll give you the simplified answer first. Based on what my associates do, which is to verify the information, the -- some of the systems that you mentioned there are for in-depth research; my associates do not complete in-depth research.
Mr. Lyngklip: Okay, why is it that your associates do not complete in-depth research?
Ms. Tuskey: They do that because, when the -- we had a representative from each bureau actually come to Capital One in – I can verify this, I want to say it was like February of 2000. . . . A representative from each bureau came on three separate visits, so a Trans Union rep came, Experian rep, and then an Equifax rep. . . .And they came to explain to my team how to more properly and more accurately work accounts, the cases. One of the questions that I had for them, as a manager, was should we verify the accounts -- and I even explained to them what my definition of verify is -- which is, we pull up our system of record, in this case Unisys or Beast, we look at what the bureau has sent us on the ACDV. If there are any discrepancies, we make sure that what the bureau has mirrors exactly what we, as Capital One, have. That's verifying.
Mr. Lyngklip: That was what you described to the representatives as verifying?
Ms. Tuskey: Yes.

Mr. Lyngklip: And what did they say in response to that?
Ms. Tuskey: Well, I actually followed that up with, 'Do you want us to do that, or do you want us to do things such as pull statements, etc., actually do the research which would involve CHIA?' And in each case, the bureau rep said, No, we want you to verify it. We want you to make our system look like your system. So that's what we've been doing.

It is important that Capital One understand that the *comparison* it currently conducts after receiving a consumer dispute does not amount to an *investigation* and is insufficient in many instances to determine whether a consumer's dispute is valid and whether information would need to be corrected. One such instance would be a mixed files case, in which two consumers' payment histories are merged together for credit reporting purposes because of a similarity in their names and/or SSNs. Although there are no authoritative numbers as to the extent of the mixed files problem, there is ample evidence that it is not uncommon. Another instance would be identity theft, which, in a sense, is a component of the mixed file category (since the activities of the fraudster are mixed into the credit history of the innocent victim). Another would be divorce.

To conduct an adequate reinvestigation, Capital One would need to take the appropriate *investigative* steps to learn if a consumer's dispute warranted a correction in the data it reported to CRAs. Naturally, the appropriate steps would depend on the circumstance. For starters, it needs to pay close attention to the nature of the dispute and all dispute-related information originally submitted by the consumer to Capital One or to the CRA. In some instances, Capital One might need to check archived material, like original credit applications or payment records. In other instances, it might need to check for similarities in names and/or SSNs that could cause a mixed file. In still others, it would need to know how to assist a customer who has become a victim of identity theft clear up a polluted history. Finally, in some cases, Capital One might be able to clear up an inaccuracy with a quick phone call. A second concern regarding accuracy is the volume of consumer disputes and the time available to process them. Ms. Tuskey testified that Capital One handles approximately 4,000 disputes per day, and her team members were expected to process 30 disputes per hour. This leaves about two minutes per each dispute. In my opinion, this sort of production quota, which is governed by the ratio the number of handlers to the number of disputes, makes it difficult, if not impossible, for Capital One dispute handlers to adequately investigate consumers' legitimate disputes over inaccurate data in their credit reports. In my opinion, such a system pressures Capital One personnel into prioritizing the *quantity* of data processed over *data quality* (e.g., accuracy, truthfulness and completeness).

A third concern is the adequacy of training. It does not appear that Capital One's credit report specialists receive much in the way of formal training.

Mr. Lyngklip: How did you find out about the procedures and in terms of how they come to their decision, and how did you find out about the mechanics of the credit dispute process?
Ms. Tuskey: I found out the way any new associate would find out. I had side-by-side training. At the time that we're looking into here, we had no formal policies or procedures, no written documentation. It was really all on-the-job training, so I

became familiar by sitting with a veteran associate as well as a quality associate just like everybody else. . . .

Mr. Lyngklip: This might sound like a silly question, and I don't mean to be flip at all, but who trained the first staff person? Do we know how those procedures were handed down and where they came from originally?

Ms. Tuskey: No. My guess, since everything had not been documented at all, my guess is it was just like oral history; you tell me and I'll tell the next person and the next person, and a lot of judgment calls going on.


Mr. Lyngklip: Now, that describes how the decision-making process is made in terms of whether or not a particular dispute will be resolved in favor of or against a consumer, what about the mechanics of navigating the screens? Is that something that's written down in training manuals or guides?

Ms. Tuskey: Now it is.

Mr. Lyngklip: Again, when was that implemented? Ms.

Tuskey: Three weeks ago.

The issue of credit report accuracy, and the factors that can cause inaccuracy (i.e., mixed files, clerical errors, divorce, co-signer arrangements, identity theft), and the relevant standards under FCRA, can be complex. Accordingly, it is important that Capitol One personnel responsible for evaluating consumer disputes are adequately trained.

As Capitol One and the CRAs are well aware, Congress devoted a substantial portion of 2003 investigating and emphasizing the importance of fairness, accuracy and privacy in credit reporting. The process left no doubt that accuracy was important to consumers, and that inaccuracy potentially was very damaging on a number of fronts. It ultimately approved legislation to further advance these goals, paying particular attention to the important roles and duties of furnishers, like Capitol One, and the CRAs.

In his written testimony before a June 24 hearing before a House Financial Services subcommittee, Capital One Vice President Scott Hildebrand stated, "(I)t is an absurd argument that those who use the data as part of their credit granting process do not have a significant stake in the accuracy of the information provided on consumers. Put most simply, at Capital One, our models do not work if the information contained in the bureau reports is not accurate."

What Capital One must understand is that consumers, including Capital One customers, will not be able to benefit from the FCRA's accuracy mechanisms if Capital One continues its current practice of responding to a consumer dispute with a "two- dimensional" data comparison between the ACDV and its own databases. In my opinion, Capital One will continue to contribute to inaccuracy in the credit reporting system if it does not cure these defects and substantially revamp the current policies and practices addressed in this letter.

Accordingly, it is incumbent upon the CRAs to ensure that Capital One's customer dispute system meets appropriate standards and that the data Capital One reports to CRAs following a consumer dispute are reliable. If Capital One fails to cure the problems identified in this letter, then CRAs would be remiss in relying on Capital One's representations that it had "investigated" and "verified as accurate" data disputed by consumers.

**[End of Excerpts From December 2003 Letter]**

I never received a substantive response from Cap One.

### (3) Parade of Notice – 4th Circuit's Opinion in <u>Johnson v. MBNA</u>

Both before and after my letter, two federal courts – U.S. District Court for the Eastern District of Virginia, in Richmond where Cap One had its headquarters, and the U.S. Court of Appeals for the Fourth Circuit – issued opinions that held unequivocally that the type of ACDV-Exchange-and-ID-data-comparison conducted by Cap One and other furnishers did not amount to a reasonable investigation under the FCRA. I quote at length from these two opinions not to express any legal opinions or conclusions, but because, in my expert opinion, these very important court rulings provided important notice to Cap One regarding the need to change its investigation procedures.

By way of background, the FCRA lawsuit, filed by Leonard Bennett, stemmed from an MBNA MasterCard opened by Plaintiff Linda Johnson's ex-husband, Edward Slater, in 1987 – four years before he married her. They had since divorced. Johnson said she was only an authorized user, which meant she was not responsible for paying the account. In December 2000, Slater filed for bankruptcy, and MBNA promptly removed her name from the account. That same month, MBNA contacted Johnson and informed her that she was responsible for the approximately $17,000 balance on the account. After obtaining copies of her credit report from Experian, Equifax, and Trans Union, Johnson disputed the MBNA account with each of them. Experian and Trans Union sent automated consumer dispute verifications (ACDVs) to MBNA specifically indicating Johnson's claim that she was not a co-obligor on the account.

MBNA agents responded by conducting the ACDV-Exchange, comparing the disputed data with the account information contained in MBNA's computerized Customer Information System (CIS). Since the two were identical, MBNA "verified" that the disputed information was correct. In other words, MBNA did nothing more than confirm that it indeed reported the original (inaccurate) data. The CRAs continued to report it on Johnson's credit report.

Tricia Furr, an MBNA credit reporting specialist, confirmed that MBNA's "Desktop Procedure" manual directs specialists to confirm a match of two out of three identifiers – name, address and/or SSN. Once a two-out-of-three match is established, MBNA can inform the CRA that the disputed information is "verified as reported." Ms. Furr said that MBNA's "reinvestigations" did not go beyond the information contained in its own CIS.[5]

---

[5] The depositions of MBNA personnel were taken in the case, <u>Linda Johnson v. MBNA America Bank, N.A.</u>, (E.D. Va) 3:02-cv-523.

Reading from MBNA's internal records, MBNA Vice President Edward Hughes quoted an MBNA employee's communication to a customer's attorney: "It would be up to (c)ard holder to prove MBNA was reporting wrong, not MBNA proving right."

The jury disagreed with MBNA's argument that its actions did not violate the FCRA, and awarded Johnson $90,300 in damages.

Judge Richard Williams affirmed the jury verdict. "According to [MBNA], the duty to investigate means that any investigation is sufficient, no matter how cursory. Such a construction is illogical. There would be no point in having the statute, and the requirement of an investigation, if there was no qualitative component to the investigation. The statute itself does impose a qualitative component to the [MBNA's] negligence," Judge Williams said.[6]

MBNA appealed Judge Williams' decision. But on February 11, 2004, the Fourth Circuit affirmed, finding that MBNA's standard response to consumer disputes did not amount to a true "reinvestigation" under the FCRA.

"MBNA argues that the language of § 1681s-2(b)(1)(A), requiring furnishers of credit information to 'conduct an investigation' regarding disputed information, imposes only a minimal duty on creditors to briefly review their records to determine whether the disputed information is correct," the panel wrote, in an opinion authored by Chief Judge William W. Wilkens. "Stated differently, MBNA contends that this provision does not contain any qualitative component that would allow courts or juries to assess whether the creditor's investigation was reasonable."[7]

"The key term at issue here, 'investigation,' is defined [by the dictionary] as 'a detailed inquiry or systematic examination.' Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors," he wrote.

Further, he said, the statute "uses the term 'investigation' in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute – and, ultimately, correct – inaccurate information on their credit reports, Congress used the term 'investigation' to include superficial, unreasonable inquiries by creditors. We therefore hold that § 1681s-2(b)(1) requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified."

MBNA also tried to argue that its investigation in Johnson's case was reasonable. But the court pointed to the specific nature of Johnson's dispute, and the testimony of MBNA agents that their investigation was primarily limited to (1) confirming that the name and address listed on the ACDVs were the same as the name and address contained in the Customer Information System, and (2) noting that the CIS contained a code indicating that Johnson was the sole responsible party on the account.

---

[6] Johnson v. MBNA, op. cit., bench ruling February 24, 2003
[7] Johnson v. MBNA America Bank: 357 F.3d 426 (4th Cir. 2004).

"The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS and never consult underlying documents such as account applications. Based on this evidence, a jury could reasonably conclude that MBNA acted unreasonably in failing to verify the accuracy of the
information contained in the CIS," Judge Wilkens wrote.

### (4) Parade of Notice – My Book

The first edition of my book, "Credit Scores and Credit Reports," was released in June 2004.    The book had an entire chapter, "Reinvestigations (or not)," describing inadequacies in the system for responding to consumer disputes about credit report inaccuracies.  The chapter devoted considerable coverage to Cap One's system and quoted at length from the same deposition of Pam Tuskey excerpted above.  It also contained a discussion of the court opinions in Johnson v. MBNA, which included the following passage:

> Richard Rubin, a Santa Fe, New Mexico attorney who argued the case for Johnson before the Fourth Circuit, noted that the panel adopted his position that had MBNA simply told the truth and stated that its investigation was inconclusive, the CRAs would have deleted the tradeline as required by the FCRA, and the litigation never would have occurred.

Also relevant to the issue of notice to Cap One was the fact that Michelle Singletary, whose weekly *Washington Post* personal finance column, entitled, "The Color of Money," which is syndicated in over 100 newspapers nationwide, named by book, "The Book of the Month" for July 2004.

In Singletary's review of my book, she noted:

> In "Credit Scores & Credit Reports," you get information based on advice from top consumer attorneys on how to dispute errors, ***and you learn what happens when credit bureaus investigate consumer claims of inaccuracies (actual court testimony from officials in the credit industry will make you shudder***). ["Unlocking the Mysteries Of Your Credit Score," by Michelle Singletary, *Washington Post*, Sunday, July 11, 2004; Page F01 (Front Page of Business Section, emphasis added.)

### (5) Parade of Notice – Alabran v. Cap One

Another poignant court opinion came in December 2005 in the case of Alabran v. Cap One.  Again, I quote at length from this opinion not to express any legal opinions or conclusions, but because, in my expert opinion, this court ruling provided

15

important notice to Cap One regarding the need to change its investigation procedures.

Here are few facts cited by the court in <u>Alabran</u>:

14. Capital also received three automated customer dispute verification (ACDV) requests on each account from the three credit reporting agencies (Equifax, Experian, and TransUnion) (CRAs) from May through September 2003describing the dispute as "Not his/hers" and asking the Defendant to "Provide complete ID."

15. In each instance, Capital reviewed its account records, noted that payments had been made on the accounts from checking accounts with the Plaintiff's name and the same billing address on the payment checks, and verified the account information back to the CRAs.

16. When reviewing an ACDV notice, Capital did not review any other records it may have maintained on the consumer, even though it had to know that the dispute was based on account information it had forwarded.

Here are some excerpts from the opinion:

As to the merits of Plaintiff's FCRA claims, Capital argues that it cannot be held liable for any violation, as a matter of law, because it was only obliged to respond in a reasonable way to any inquiry from a CRA and that it did so. Specifically, Capital asserts that it received multiple ACDV notices from the CRAs and that all of them reported only an identity dispute ("Not his/hers. Provide complete ID."), not an identity theft or fraud alert. As such, Capital asserts it was only required to confirm personal identifiers in the account, that is, "whether the Larry Alabran who owned these accounts was the same Larry Alabran who was now disputing them." (Id. at 8).

Accordingly, Capital reviewed such personal identifiers as name, social security number, address, and mother's maiden name and confirmed:

to a sufficient degree of confidence that permitted Capital One Bank to conclude that the Larry Alabran who had used and enjoyed these credit card accounts for more than six years during the course of his marriage to Mersine, was the same Larry Alabran who was now disputing these credit card accounts for the first time, shortly after he filed for divorce.

In support of its position, the Defendant urges the court to adopt the holdings from other circuits involving the same CRA notification, "Not his/hers. Provide complete ID.," in which those courts (district and appellate levels) found that such notice was too "scant" or otherwise insufficient to require the furnisher to do anything more than Capital did in the present case. Specifically, the Defendant relies on Westra v. Credit Control of Pinellas, 409 F.3d 825 (7th Cir. 2005), and Malm v. Household Bank, N.A., *supra*, in which both courts held that the scope of "reasonableness" for the required investigation by a furnisher in

response to a notice of a consumer's dispute from a CRA is defined and confined by the information provided in the notification, and that the simple indication that the consumer was disputing a charge, without any indication of possible fraud or identity theft, did not require the furnisher to do more than confirm the identity of the protesting consumer.

At the same time, the Plaintiff asserts that the Fourth Circuit opinion in <u>Johnson v. MBNA America Bank, N.A.</u>, 357 F.3d 426, 431 (4th Cir. 2004), controls whereby the court held "that §1681 s-2(b)(1) requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified," and that the factfinder (jury) had a basis to find that the furnisher's efforts, which the Plaintiff asserts mirror those of Capital here, were unreasonable. The multiple notifications from different CRAs in Johnson were "CONSUMER STATES BELONGS TO HUSBAND ONLY" and "WAS NEVER A SIGNER ON ACCOUNT. WAS AN AUTHORIZED USER." The court in Johnson interpreted such information as indicating the consumer was disputing that she was a co-obligor on the account so that mere confirmation of the identity of the consumer without reference to additional information available to the furnisher in its own records would – and did – form a sufficient basis for the jury to have found the furnisher's investigation to be unreasonable.

In the present case, Capital argues that Johnson is not controlling because the information provided by the CRA notification in Johnson was quantitatively different where the furnisher was clearly put on notice that the dispute involved more than the consumer claiming that he/she was not the same person who was obligated on the account. However, aside from the fact that Westra and Malm are not controlling for being from other circuits, they are distinguishable from Johnson and this case for a different reason, and with a different result, than urged by Capital. ***Specifically, in Johnson and here, the Plaintiff had lodged the dispute directly with the furnisher involved as well as the CRAs, and although the furnishers did not have the obligation under § 1681 s-2(b)(1) to conduct a "reasonable" investigation until they received notice from a CRA, they maintained the specifics of the dispute in their records that would have detailed the problem if the investigation reached beyond simply confirming identity.*** The issue in both Westra and Malm was that of identification, that is, whether the person making the dispute was the same person who was obligated on the account, *i.e.*, ID fraud.[9] In both Johnson and the present case, however, the dispute concerned whether the person making the dispute was an authorized user and, if so, whether they were obligated for the indebtedness. In addition, and particular to this case of whether dispositive relief is available to Capital, its own Rule 30(b)(6) witness testified in deposition that Capital had received the same dispute code over time in regard to consumer disputes in which Capital understood that the consumer, like the Plaintiff here, denied the obligation because they were only an authorized user versus not being the person who had used the card.

*[Excerpts continued on next page.]*

> *Nevertheless, a Capital employee responding to an ACDV notice of consumer dispute would not conduct any investigation under any circumstance of even Capital's own internal files beyond confirming identity which allows for the reasonable inference that no further investigation would be undertaken even if there was an indication of fraud.*

In both <u>Westra</u> and <u>Malm</u>, the consumer lodged his/her dispute with only the CRA (or, as in Malm, with a successor creditor/furnisher) such that the furnisher involved did not have any additional information at its disposal to at least clarify what those courts concluded to be insufficient notification. Here, Capital's own witness has confirmed in discovery that the notification of "Not his/hers" indicated that the consumer disputed that he/she was a co-obligor on the account, the same significance attached by the court to the arguably more specific notice in Johnson. As such, dispositive relief is precluded where there exists a genuine issue of disputed material fact as to whether, under the particular facts and circumstances of this case, ***Capital usurped any obligation to conduct a reasonable investigation upon receipt of the CRA notices because it had at least clarifying information available.***

### [End of Excerpts From Opinion in Alabran—emphasis added]

I emphasized the above passages to underscore direct and robust notice to Cap One regarding the importance of considering all of the relevant information available to it after receiving a consumer's dispute from the CRA.

### (6) Parade of Notice – Other FCRA Litigation

Cap One has been sued in other cases over its failure to correct errors after receiving consumers' disputes. I list the following cases in which I was retained as Plaintiff's expert, and which all settled for a confidential sum, as further notice to Cap One that its routine practices and procedures were failing to ensure accuracy and was damaging to consumers.

<u>Steven E. Beck v. Equifax Information Services, et al.</u>: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347. FCRA. Expert report, deposition.

<u>Larry Alabran v. Capital One Services, Inc.</u>: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

<u>Bernice Hardin v. Capital One Bank, Experian Information Solutions, Inc., et al.</u>: U.S. District Court for the Eastern District of Virginia [Richmond Division]; 3:CV-07-604. Expert report.

<u>Christina Lee v. TransUnion, et al.</u>: U.S. District Court for the District of Oregon (CV-07-0998-MO).

Emelia Pasternak v. TransUnion, LLC, et al., U.S. District Court for the District of Northern California, No. 4:07-cv-04980-CW; and 4:08-cv-02972-CW.  Expert Report, deposition.

Jose Soto v. Capital One Auto Finance, et al.: U.S. District Court for the District of Western Washington (2:08-cv-01838-RSM).

## Cap One Disregards Notice

As we can see, Cap One repeatedly has been put on notice of the problems with it routine policies and practices.  All of the forms of notice cited above combined to inform Cap One that it was foreseeable that Cap One would create more victims of chronic inaccuracy unless it changed its routine practices and procedures, in my opinion.  Given the damage to previous Cap One victims of chronic inaccuracy, Cap One's failure to make the necessary changes was reprehensible, in my opinion.

However, Plaintiff's experience confirms that Cap One has no intention of making the changes necessary to cure the gross inadequacies in its system for handling consumer disputes.

Thus, it appears that a sufficiently forceful enforcement action would be necessary to prompt Cap One to make the necessary changes, in my opinion.

## Plaintiff's Problems With Cap One Would Have Persisted Absent A Lawsuit

Like other victims of chronic inaccuracy, including the cases cited above, the Plaintiff problems would have persisted until litigation or the threat of litigation forced a more thoughtful review of his case.

## Underlying Incentive For Furnishing

Many people do not realize that creditors' furnishing of their customers' data to credit reporting agencies (CRAs) is entirely voluntary.  A fundamental incentive for large creditors such as Cap One is that credit reporting is a cost-effective means of enhancing debt collection.

Cap One is keenly aware that credit reporting is a "powerful tool designed, in part, to wrench compliance with payment terms." (Rivera v. Bank One, 145 F.R.D. 64, 623 (D.P.R. 1993)).  Creditors' collection letters and debt-collecting operators often advise customer-debtors that if they don't pay their debt it will result in highly derogatory data being entered on that customer's credit report which may remain for up to seven years.  Creditors' collection letters often advise customer-debtors that, "Any potential employer, mortgage company, car dealership or creditor is likely to see this remark.  Such a condition is far more damaging than the delinquent status you now maintain."

When a consumer applies for a mortgage, or other major form of credit, the mortgage or credit often is not granted until all outstanding unpaid debts listed on the credit report are resolved.  Thus, a creditor that is owed money, or that still hopes to collect money whether or not

it is actually owed by the consumer, enhances its ability to garner payment by reporting the debt to that consumer's credit report.   This practice is highly problematic and damaging to the consumer when the consumer in fact does not actually owe the amount being reported to his credit report.  However, it is conceivable that such practices would cause consumers, particularly those who did not know their rights, to consider paying off debts that they did owe in order to remove serious derogatory data from their credit reports.

As I wrote in my book, "Credit Scores and Credit Reports,"

> ... Creditors view credit reporting as an arm of debt collection – a sort of last resort that will catch up with non-paying consumers sooner or later. This practice "crosses the line" when creditors and collectors threaten to report debts – or actually report debts – that they know or should know are not the responsibility of the consumer.  [Page 31 – Second Edition]

Cap One crossed that line in the case of Plaintiff, in my opinion.  Despite disputes directly from Plaintiff, as well as the disputes forwarded to Cap One by the CRAs, Cap One repeatedly failed to conduct reasonable investigations and continued to report the erroneous debts to his credit reports

## Part 2

### Potential Areas of Testimony: General Issues, Context

**Table of Contents**

A.    **The Nature and Purpose of Credit Scores**
B.    **The Nature and Purpose of Credit Reports**

### Nature & Purpose of Credit Scores

It is possible that the trier of fact is not intimately familiar with either the credit reporting or credit scoring systems.  If this is the case, I can provide expert testimony on the nature of both systems, how to read and understand credit reports and how to dispute errors, the parameters of credit scoring, the general impact that derogatory data have on a credit score, the interplay between identify theft, credit scoring and credit reporting, and other related matters.

A credit score is a number that reflects a consumer's creditworthiness at a given point in time.  The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which licenses it to Equifax, Experian and Trans Union and others.  The scoring range for the FICO "classic" model is 300-850.  The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union, are based upon the FICO model.  The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing,

personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

Maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans and credit cards.

For example, the Web site of Fair Isaac Corp., www.myfico.com, (Visited January 9, 2012) gives this example of the difference that credit scores make in terms of interest and monthly payments, on a $300,000 30-year, fixed-rate mortgage:

| Your FICO® Score | Your Interest Rate | Your Monthly Payment |
|---|---|---|
| 760 - 850 | 3.581% | $1,361 |
| 700 - 759 | 3.803% | $1,398 |
| 680 - 699 | 3.980% | $1,429 |
| 660 - 679 | 4.194% | $1,466 |
| 640 - 659 | 4.624% | $1,542 |
| 620 - 639 | 5.170% | $1,642 |

A similar chart exists for auto loans.   Moreover, about half of the major credit card companies practice "Universal Default," meaning that these companies will raise their cardholders' interest rates if those cardholders' credit scores drop below certain levels – even if the cardholder never had a late payment with the company.

1. The precise workings of the FICO score are highly proprietary and therefore closely guarded. However, the general parameters are publicly available:

**35% -- Payment history.** Late payments, particularly major or serious derogatories, like 90-days late or worse, and particularly on important accounts like mortgages, are very damaging to one's credit score.

**30% -- Credit Utilization.** The ratio between available "revolving" credit and how much is actually used (credit card balances vs. credit card limits).

**15% -- Length of Credit History.** The longer you maintain a positive credit history, the better it is for your credit score.

**10% -- How Much New Credit?.** This relates to "inquiries" that creditors make when you apply for credit.

**5% -- Healthy Mix of Credit?** The scoring model prefers to see a "healthy mix" of mortgage, credit cards and perhaps other kinds of credit.

(These parameters are published in Chapter 1 of both Editions of "Credit Scores and Credit Reports," op. cit.)

2.      It is important to understand that consumers are most severely penalized when they have a serious derogatory within the past eleven months. The "importance of being recent" is illustrated by the following Fair Isaac chart, which shows, in a proportional sense, that a major delinquency in the past year has a 93% negative impact, while a major delinquency between 1-2 years-old has about a 60% negative impact; a major delinquency between 2-3 years-old has a 44% negative impact; a 3-4 year old delinquency has a 33% impact; any delinquency older than 4 years has only a 22% negative impact.

**Previous credit performance**



MONTHS SINCE MOST RECENT MAJOR DELINQUENCY

There is growing public awareness about credit scoring, but it is by no means complete. A September 2004 survey by Opinion Research Corporation Intl. sponsored by the Consumer Federation of America (CFA) and Providian Financial, a major credit card issuer, found that:

Few consumers know what constitutes a good score. Only 12% correctly identified the low 600s as the level below which they would be denied credit or have to pay a higher, sub-prime rate. (One-third thought this level was the low 500s, and 30% said they didn't know.) And, only 13% correctly understand that scores above the low 700s usually qualify them for the lowest rates. http://www.consumerfed.org/092104creditscores.PDF

A March 2005 General Accounting Office study found that about one-third of respondents had obtained their credit scores.   While 70 percent of respondents correctly identified the definition of a credit score and understood many of the factors that could impact credit scores, only 28 percent could provide a number within a range of possible credit scores. In addition, consumers were more familiar with some of the factors that affected credit scores than

with others. For example, while most consumers knew that skipping loan payments or making late credit card payments had a negative effect on credit scores, about half did not know that using all the credit available to them, such as reaching the maximum limit on a credit card or home equity loan, had a negative effect. Also, when asked about information that had no effect on credit scores (such as a low checking account balance), about half of consumers answered the questions incorrectly or said that they did not know, the GAO found. (General Accounting Office, "Credit Reporting Literacy: Consumers Understood the Basics but Could Benefit from Targeted Educational Efforts" (GAO-05-223). www.gao.gov/new.items/d05223.pdf

## Nature & Purpose Of Credit Reports

Similar to credit scoring, there is growing public awareness about the credit reporting system, but it is not universal.

According to a July 2003 survey by the Consumer Federation of America, "Only 25 percent of Americans -- and less than 20 percent of those with incomes below $35,000 -- said they knew what their credit score was. But only three percent of Americans could, unprompted, name the three main credit bureaus-Experian, Equifax, and Trans Union-that provide both lenders and consumers with information from credit reports.  Forty-three percent of Americans (35 percent of those with incomes below $35,000) said they had obtained a copy of their credit report from the three credit bureaus in the past two years."

A March 2005 General Accounting office report concluded that the public's understanding of credit reports and credit scores was improving, but that a federal education campaign was needed to better inform those segments of the population that remain unfamiliar with the systems.  The report found that 60 percent of respondents had seen their credit reports, most often because they were making a large purchase or refinancing a loan. Most of these consumers said that they understood their reports.  However, about half (53 percent) did not know that information could stay on their report for 7 or 10 years.[8]

It is important that the trier of fact have an accurate understanding of the nature and purpose of credit reports.  Accordingly, a brief description of the consumer report is fundamental to my opinions in this case.

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information, such as name, address, phone number and Social Security Number (SSN).  There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans Union and Experian.   The CRAs regularly receive updates on a consumer's credit relationships

---

[8] *Ibid.*

from credit grantors -- banks, mortgage companies, credit card issuers, department stores and others. The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history. It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)   A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.

(2)   A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.

(3)   If applicable, a section showing *public record* information, like bankruptcies, court judgments and tax liens.

(4)   A section showing *inquiries*, in other words, those companies which accessed the report and for what purposes.

In addition, attached to the credit report is

(1) A form for disputing errors, and
(2) A statement of your rights under the FCRA

Each of the Big Three CRAs uses a slightly different format. A fundamental purpose of the credit report is to describe a consumer's creditworthiness. For example, the Equifax report lists the codes showing how consumers are classified when they don't pay their bills on time. Along with these numeric codes, a credit report can have a letter showing the type of credit, i.e., "R" for revolving (credit card) and "I" for installment (personal loan). The code for someone who always paid his credit card on time would be "R1." Here are the numeric codes:

2 : 30-59 Days Past Due
3 : 60-89 Days Past Due
4 : 90-119 Days Past Due
5 : Over 120 Days Past Due
7 : Included in Wage Earner Plan
8 : Repossession
9 : Charge Off
Blank : No Data available for that month
0 : Too new to rate, or unrated
1 :  On Time

The Trans Union and Experian credit reports describe similar categories with a text narrative, rather than with an alpha-numeric code.

It is important to note that public record information like bankruptcy, judgments and tax liens, and charge-offs (R-9) and collections, are considered some of the most negative entries. It is also important to note that when a creditor reports a negative tradeline as disputed, that tradeline typically is not scored and therefore does not negatively impact the credit score.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit, whether it is a loan or a credit card. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers use credit reports for underwriting purposes, and also use credit scores, but presumably only where not prohibited by State law.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers also can use credit reports for underwriting purposes. Landlords also use credit reports for tenant screening.

**Background & Qualifications (Curriculum Vitae Attached)**

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covers credit reporting, Fair Information practices and related matters;

(2) Author of the book <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u>, 3rd Edition, (Privacy Times 2005), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation:

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (3rd Edition, Privacy Times 2007. The book has 23 Chapters, 399 pages and 415 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights.   I also am co-author of <u>Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society</u> (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts.  As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and

practices for handling personal data.    In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets.  To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.  Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified numerous times before Congress – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information.  (Consult CV for list of hearings and Web links to testimony.)

In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[9]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[10]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[11]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[12]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

---

[9] http://banking.senate.gov/03_07hrg/071003/index.htm
[10] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[11] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[12] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

I regularly present at Continuing Legal Education or professional seminars related to the FCRA. (Consult CV.)

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices." First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

**Testimony & Expert Reports**

I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies.   Expert report, deposition, trial testimony. Judge Lourdes Baird presiding.   The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures. (see 225 F.3d 1063 (2000)).

Angela P. Williams vs. Equifax Information Services, LLC, et al., Circuit Court for the Ninth Judicial Circuit, Orange County Florida.   Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony. Judge George A. Sprinkel IV presiding.

Eric Robert Drew  vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California, Case No.  CV 07-00726-SI.   Expert report, Deposition, Trial Testimony. Judge Susan Illston presiding.

Direct Data Solutions, Inc., v. Bailey & Associates Advertising, Inc.: Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida; Case No.: 07-9322 CA 09.  Judge Jerald Bagley presiding.

Brenda F. Campbell v. Experian: U.S. District Court for the Western District of Missouri (No. 07-2514).  FCRA.  Expert report, deposition. Trial Testimony.  Judge Nanette K. Laughrey presiding.

Laura Jones v. Capital One:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case 09-14499-BFK, Chapter 7. Post-bankruptcy credit reporting. Expert report. Trial Testimony.  Judge Brian F. Kenney presiding, said from the bench:

> "Before we begin with Mr. Hendricks, a brief disclosure. I had a case a few years ago. Mr. Hendricks may recall that I was representing a creditor in which Mr. Hendricks was identified as an expert witness in the Eastern District of Virginia. I believe it was the Sloane case, Mr. Hendricks. I took Mr. Hendricks' deposition and I subsequently moved to exclude him as an expert in the case on a Daubert challenge. I lost the Daubert challenge. The court allowed him to testify as an expert witness; and I will say, during the course of his deposition and the Daubert challenge, I learned quite a bit about credit reporting. Just in the interest of full disclosure, I'll disclose that to the parties."

In Re: MicroBilt Corp. et al., U.S. Bankruptcy Court for the District of New Jersey (Trenton Div.); Case No. 11-18143 (MBK).  Deposition, Trial Testimony. (I was retained by MicroBilt counsel Bruce Luckman, who in previous years as counsel for TransUnion, unsuccessfully opposed me with a Daubert challenge in the Sandra Cortez case (see below).

Steven W. Haberman v. PNC Mortgage Company, et al.: U.S. District Court for the Eastern District of Texas [Sherman Div]. Case No. 4:11cv126.  FCRA, identity theft. Expert report. Deposition. Trial Testimony.  Magistrate Judge Amos L. Mazzant presiding.

Harold & Beryllin Gamby v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Michigan [Southern Div.] (CV-06-11020-MO).  FCRA, identity theft. Expert report. Deposition. Trial Testimony.  Judge Marianne O. Battani presiding.

Deborah Adams v. National Engineering Service Corp./Verifications Inc.,: U.S. District Court for the District of Connecticut. 3:07-cv-01035-JCH.  FCRA. Expert report, deposition. Trial Testimony.  Judge Warren W. Eginton presiding.

Rebecca L. Valentine. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO. FCRA, identity theft. Expert report. Deposition. Trial Testimony.  Judge Robert E. Jones presiding.

Nicole Robinson vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.    Expert reports. Deposition. Trial Testimony   Judge Walter H. Rice presiding.

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.    Expert reports. Deposition. Trial Testimony   Judge Leonie M. Brinkema presiding.

Matthew Kirkpatrick v. Equifax, LLC,  U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO.    FCRA    Expert report. Trial Testimony. Judge Michael W. Mosman presiding.

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05 –cv—05684-JF.    FCRA.    Expert Report. Daubert Hearing. Trial Testimony. Senior Judge John P. Fullam qualified me to testify at trial.

Patricia Holmes vs. TeleCheck Intl., Inc., U.S. District Court for the Middle District of Tennessee (Nashville Div.). FCRA. Expert report. Deposition. Trial Testimony.  Chief District Judge Todd J. Campbell presiding.

Dennis F. Hollidayoke v. JBL Mortgage Services, Inc., et al: Circuit Court for Anne Arundel County, Maryland; No. 02C10155944. Trial Testimony. Judge Paul A. Hackner presiding.

Tracy Terry v. Cheryl Shepard, Eve Shepard, Frank Ferro, and STAR Consulting, LLC, CAL08-03428 -- In the Circuit Court for Prince George's County, Maryland, Michele D. Hotten, Associate Judge presiding.  Breach of contract. Damage to credit. Trial testimony.  September 22, 2009.

Federal Trade Commission vs. Accusearch, Inc., et al., U.S. District Court for the District of Wyoming, Case No. 06CV0105-D.  FTC Section 5.  Expert Report.  U.S. Magistrate Judge William C. Beaman rejected Defendant's motion to exclude my testimony.

Eddie Silva, et al. v. Haynes Furniture Co., Inc.: U.S. District Court for the Eastern District of Virginia:  No. 4:04CV82. FCRA.  Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

Joi Helmes v. Wachovia Bank N.A.:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony. Judge Robert G. Mayer presiding.

Alex Campos and Michael York v. ChoicePoint Services, Inc.: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD.  FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

Denis W. Stasulis v. Suntrust:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony. Judge Robert G. Mayer presiding.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report.  Fairness hearing testimony.  Judge Berle M. Schiller presiding.

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony Judge Florence-Marie Cooper presiding.

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA. Expert report, deposition, trial testimony.  Judge Neal B. Biggers presiding.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE.   FCRA. Expert report, deposition, trial testimony.   Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition.  Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr.  v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-

CV-626, respectively. Expert report. Affidavit. Deposition.  On the eve of trial, Judge Richard Williams rejected Defendant's motion to disqualify me. The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony. Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22. Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

Ilene Modica v. American Suzuki Financial Services, TransUnion, LLC, & Equifax Information Services, LLC: U.S. District Court for the District of Arizona. (2:11-CV-02183-PHX-DGC) Expert report. Deposition.

Denise Acquafredda v. Experian Information Solutions, et. al: U.S. District Court for the District of Arizona – (No. CV 2011-054368). Expert report. Deposition.

Jose Calderon v. Experian Information Solutions: U.S. District Court for the District of Idaho  (No. 1:11-cv-00386-EJL).  Expert report. Deposition.

First Carolina Bank v. Charles S. McCue, et al.:  In The Court of Common Please, Fourteenth Judicial Circuit, State of South Carolina, County of Beaufort.  Civil Action No: 07-CP-07-03027. Deposition.

Maria Pintos v. Pacific Creditors Assoc., et al.:  U.S. District Court for the Northern District of California [Oakland Div.]  C 03-5471 CW. Expert report. Deposition.

Marie Ann Fuges v. Southwest Financial Services, LTD: U.S. District Court for the Eastern District of Pennsylvania (No 09-699). Expert report. Deposition.

Alisha Wilkes v. Experian Information Solutions, et al.: U.S. District Court for the Eastern District of Virginia (CV- 1:10-cv-01160-CMH -TRJ). Expert report. Deposition.

Serena Beachley v. PNC Bank N.A..: U.S. District Court for the District of Maryland [Northern Div., Case No. CCB-10-1774. Expert report. Deposition.

In re: Pammalla Shannon Uplinger v. Rees Broome, P.C.,: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria Div.); Case No. 90-13129-RGM. Expert report. Deposition.

Jose Soto v. Capital One Auto Finance, et al.: U.S. District Court for the District of Western Washington (2:08-cv-01838-RSM).  Expert report, deposition.

Terri N. White, Jose Hernandez, et al. v. Experian Information Solutions, et al.: USDC-Central Dist. Of California; Case No. 05-cv-1070- DOC (MLGx). Declarations, Deposition.

Tara Andrews v. Equifax Information Solutions, Inc., et al.: U.S. District Court for the Western District of Washington; (No. 2:09–CV–00817–JJC). Expert report. Deposition.

Michelle Jansen v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. 05-CV 0385-BR. Expert report. Deposition.

James Byrd v. TransUnion LLC, Experian Information Solutions, Inc., Equifax Credit Information Services, LLC: U.S. District Court for the District of South Carolina [Columbia Div.]. Expert report. Deposition.

David L. Jackson v. Trans Union, et al.: U.S. District Court for the District of Oregon. FCRA. No. CV-08-0060-MO. Expert report. Deposition.

Richard Chakejian v. Equifax Information Services, LLC. : U.S. District Court for the Eastern District of Pennsylvania; No. 07-2211. Bruce A. Summerfield v. Equifax Information Services, LLC. : U.S. District Court for the District of New Jersey; No. 08-1450. FCRA. Expert reports. Consolidate deposition.

Marlos Uzzell v. Experian Information Systems, Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 2:08-CV-02538-CMR). Expert report. Deposition.

Baxter Robinson v. Chase Mortgage Services, Inc., et al.: U.S. District Court for the District of South Carolina (Charleston Div.) (2:08-cv-02087-PMD). Expert report, deposition.

Risa Joyce Deutsch v. Arrow Financial Services LLC, et al: U.S. District Court for Middle the District of Florida [Tampa]; No. 8:08-cv-01469. Damage to credit. Expert report, deposition.

Michael D. Scott, et al. v. Graphic Center, CalPERS, et al.: Superior Court of the State of California, County of Los Angeles. Case No. BC390593397636. Data breach. Declaration.

Christopher K. Jung v. Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 07-2514). Expert report, deposition.

Robert Saindon v. Equifax Information Services, et al.: U.S. District Court for the Northern District of California (08-cv-01744 WHA). Expert report, declaration. Deposition.

Christina Lee v. TransUnion, et al.: U.S. District Court for the District of Oregon (CV-07-0998-MO). Expert report, deposition.

Emelia Pasternak v. TransUnion, et al.: U.S. District Court for the Northern District of California. Case No. 4:07-cv-04980-CW Expert report, deposition.

Stacy Fiano v. Experian Information Solutions, et al., U.S. District Circuit Court of the Southern District of Florida 9:08-cv-80555.  Expert report, deposition.

Alana Valerie Sheldon v. Trans Union, LLC., LVNV Funding, LLC, & Resurgent Capital Services L.P.: U.S. District Court for the District of Maryland; 8:08-cv-00057-PJM.  Expert report, deposition.

In Re: Cellphone Termination Fee Cases, Superior Court of the State of California, Alameda County, JCCP No. 4332.  Deposition.

Karl Benedikt v. ChoicePoint, Inc.,: U.S. District Court for the District of New Jersey [Newark Vicinage]; 07-2569. Expert report, deposition.

Abdirizak Gayre v. CSC Credit Services, Inc., Equifax Information Services, LLC, and Afni, Inc.: U.S. District Court for the District of Minnesota (C.A. No. 07-CV-0622 [JRT/FLN]). FCRA.  Expert report, deposition.

Erin Ayles v. Experian Information Solutions, Inc.: U.S. District Court for the Eastern District of Virginia (Alexandria Division); 1:07cv 662.  Expert report, deposition.

Maria D. v. Comcast Corp., Sacramento Superior Court, Case No. 03AS05745. Deposition.

Terri N. White, et al. v. Experian Information Solutions, Inc., U.S. Dist. Ct. Central Dist. Of Calif. – Case No. 05-cv-1070- DOC (MLGx); Lead Case. Expert declarations. Depositions.

In Re: Farmers Insurance Co., Inc., FCRA Litigation, U.S. District Court for the Western District of Oklahoma, Case No. CIV 03-158-F.  FCRA. Expert report, deposition.

Steven E. Beck v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347. FCRA.  Expert report, deposition.

Mary Ann Whiteker, et al. v. Chase Bank, et al..

Ford Motor Credit Co. v. Sudesh Agrawal, Court of Common Pleas, Cuyahoga Country, Ohio; Case No. CV04536588.  Credit reporting and credit scoring. Deposition.

Larry Alabran v. Capital One Services, Inc.,: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

Gail Cope v. MBNA American Bank NA: U.S. District Court for the District of Oregon; No. 04-CV-493-JE.  Expert report, deposition.

Robert Gordon Peoples v. Experian Services Corp., et al.: U.S. District Court for the Central District of California: No. CV-04-1378 CAS (Ex). Expert report. Deposition.

Lottie Robertson v. Experian Information Services, Inc. & Capital One Bank: U.S. District Court for the Eastern District of Michigan (Southern Div.) No. 04-72308. Expert report. Deposition.

Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE. FCRA. Expert reports. Deposition

Bruce Danielson v. Experian Information Solutions: U.S. District Court for the Northern District of Texas, Case No: 3-04CV-1722N. FCRA. Expert report. Deposition.

Stacy Lawton Guin, et al. v. Brazos Higher Education Service Corporation, Inc.: USDC-Minnesota – No. CV 05-668 RHK/JSM. Negligence. Security Breach. Affidavit. Deposition.

Anthony Chin v. State Dept. Federal Credit Union: Circ. Ct. Prince George's County (Maryland); Civ. Act. No. CAL04-12778; Tort. Deposition. Trial testimony.

James M. McKeown v. Sears Roebuck & Co., et al: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C. Expert Report, deposition.

Paulette Field v. Trans Union LLC, et al., Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div. FCRA. Expert report. Deposition.

Earle E. Ausherman, et al. v. Bank of America Corporation et al.: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438. FCRA. Expert report. Deposition.

Jesse Klco v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433. FCRA. Expert report, deposition.

(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis.: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.
Bruce Butcher and Pam Butcher v. Chase Manhattan Bank, U.S.A., Inc., U.S. District Court for District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.
Karen Nienaber, et al. v. Citibank (South Dakota) N.A..: U.S. District Court for the District of South Dakota [Southern Div.}; Civ. No. CIV 04-4054. Declaration relied upon by court in settlement hearing.

### FEE

My fee is $300 per hour for preparation, consulting trial testimony, plus reasonable travel time, plus travel costs and expenses; $400 per hour, or a minimum of $1,200 per day, for deposition testimony, plus reasonable travel time, plus travel costs and expenses.

# Evan D. Hendricks

## *CURRICULUM VITAE*

## Professional Activities

1981- Present       **Editor/Publisher** of *Privacy Times*

      Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

### 1992 – Present       Expert Witness

Qualified by the federal courts in FCRA and identity theft cases. (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

### 1998 – Present       Privacy Expert Consultant, U.S. Social Security Administration

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

### 2002 – 2004    Member, Experian Consumer Advisory Council

Along with other Council members, I provide an outsider's view on credit reporting, marketing and other privacy issues.

### July – October 2002       Consultant to U.S. Postal Service

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

**Evan Hendricks P.O. Box 302 Cabin John, MD 20818**
(301) 229 7002  (301) 229 8011 [fax]  evan@privacytimes.com

---

**Recent Testimony Before Congress & The FTC**

"Keeping Score on Credit Scores: An Overview of Credit Scores, Credit Reports and their Impact on Consumers," House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit Hearing, March 24, 2010.[13]

"What Borrowers Need to Know About Credit Scoring Models and Credit Scores," House Financial Services Subcommittee on Oversight, July 29, 2008.[14]

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.[15]

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006[16]

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit, November 9, 2005[17]

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005[18]

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information,"[19] Senate Banking Committee, March 15, 2005

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[20]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[21]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[22]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[23]

---

[13] http://www.house.gov/apps/list/hearing/financialsvcs_dem/fihrn_03242010.shtml
[14] http://www.house.gov/apps/list/hearing/financialsvcs_dem/hr072908.shtml
[15] www.house.gov/apps/list/hearing/financialsvcs_dem/ht061907.shtml
[16] http://energycommerce.house.gov/108/Hearings/06202006hearing1938/Hendricks.pdf
[17] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=425
[18] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=407
[19] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144
[20] http://banking.senate.gov/03_07hrg/071003/index.htm
[21] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[22] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[23] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do [3rd Edition] (Privacy Times, 2007)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

Former Secrets: Government Records Made Public Through The Freedom of Information Act (Campaign For Political Rights, 1982)

**International Lectures**

24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales – Presentation published in conference proceedings, 2002)

The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne – Presentation published in conference proceedings, 2001)

The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)

The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994). In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and Privacy Commissioner of Australia.

**Presentations/Instruction At Recent CLE & Professional Seminars**

"Key Privacy Statutes - FCRA and Background Check Problems," Conference on Effective Consumer Privacy Enforcement, Univ. of California-Berkeley Samuelson Law, Technology & Public Policy Clinic. Oct. 13-14, 2011. Berkeley, Calif.

"Annual FCRA Conference," National Association of Consumer Advocates. May 20-21, 2011. Memphis, Tenn.

"91st Annual New York Meeting," Commercial Law League of America (CLLA) November 12, 2010

"2010 NCLC Consumer Rights Litigation Conference," National Consumer Law Center. November 13, 2010. Boston, Mass.

"26th Annual Consumer Bankruptcy Course," State Bar of Texas. June 3, 2010. Dallas.

"Consumer Protection Law Comm. Representing Main Street: A Consumer Law Primer" Florida Bar Association; June 26, 2009. Orlando.

"Second Law and Information Society Symposium: Enforcement, Compliance and Remedies in the Information Society," Presenter, "Credit Report Cases – Effective Remedies?" Center on Law and Information Policy (CLIP), Fordham Law School, New York, May 29-30, 2008.)[24]

"The 1st Annual Privacy Law Scholars Conference," Presenter, "Assessing Privacy Harm: How can victims of privacy violations prove that they have been harmed?  The George Washington University Law School, Washington, DC, June 12-13, 2008.[25]

"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21, 2006 (New York City)

"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer Law Center, October 27, 2005

"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005

"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute, February 28- March 1, 2005 (New York City)

"The New FACT Act: Challenge & Oppty.," Privacy & American Business, Feb. 9-10, 2004

"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process," Glasser LegalWorks, Sept. 28-29. 2004

"12[th] Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004

**Professional Societies**

Past President & Board Member, American Society of Access Professionals www.accesspro.org

**Industry Certification**

FCRA Certification, National Credit Reporting Association (www.ncrainc.org).

**Media**

In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996, I am quoted regularly by major and small newspapers (including The Washington Post, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek and Money Magazine), regarding issues of privacy generally and the privacy implications of consumer reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News, CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey Show and Geraldo, regarding these issues as well.

---

[24] http://law.fordham.edu/ihtml/eventitemPP.ihtml?id=37&idc=8943&template=clip
[25] http://privacyscholars.com

**Education**

Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)

**MATERIALS CONSIDERED**

In specific preparation for this case, I have reviewed the following:

Plaintiff's Complaint
Plaintiff's Credit Reports
Various correspondences by Plaintiff, Cap One & third parties
Cap One's Initial disclosures
Experian's Initial disclosures
Bates-stamped documents produced by Plaintiff & Trans Union

I also generally rely upon:

The Fair Credit Reporting Act & Consumer Credit Reporting Reform Act of 1996
Fair Credit Reporting Act (w/ Companion Disk & 2000 Cumulative Supplement,
National Consumer Law Center, 1998 (Boston)
Credit Scores and Credit Reports: How The System Really Works, What You Can
Do (3rd Edition, Privacy Times 2007),

My opinions in this case are also based on my 31-year profession of following
privacy developments including those relating to the consumer reporting and information
broker industry and the criminal justice system as a journalist, editor, publisher and
privacy expert. My experience includes listening to and participating in dozens of hours
of Congressional testimony, hearings before the Federal Trade Commission, media
coverage, studies by independent groups, my own personal observations and numerous
contacts, and my previous work preparing to be an expert witness in other FCRA cases.

**Executed This The 24th Day of September 2012 in Bethesda, Maryland**


/s/ Evan D. Hendricks
**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002

*Exhibit "1"*



MC LEAN VA 22102

| | | |
|---|---|---|
| Postage | $ | $0.00 |
| Certified Fee | | $2.80 |
| Return Receipt Fee (Endorsement Required) | | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $2.80 |

7003 1010 0003 9472 1338

Sent To: RICHARD FAIRBANK - CAPITL ONE
Street, Apt. No.; or PO Box No. 680 Capital One Dr
City, State, ZIP+4 McLean, VA 22102

# Office of Evan Hendricks

December 2, 2003

Mr. Richard D. Fairbank
Chairman & Chief Executive Officer
Capital One Financial Corporation
680 Capital One Dr.
McLean, VA 22102

Donald A. Robert
Chief Executive Officer
Experian North America
75 Anton Blvd.
Costa Mesa, CA 92626

Mr. Harry Gambill
Chief Executive Officer
Trans Union LLC
555 West Adams Blvd
Chicago, IL 60611

Mr. Thomas F. Chapman
Chairman of the Board & Chief Executive Officer
Equifax, Inc
1550 Peachtree Street
Atlanta, GA 30309

Dear Sirs:

As an expert on issues relating to credit reporting, Fair Information Practices and privacy, I am writing to you concerning Capital One's procedures for handling consumer disputes regarding the accuracy of data that Capital One reports to consumer reporting agencies (CRAs). (A copy of my background and qualifications is attached.)

I have analyzed a deposition from a Capital One employee responsible for implementing Capital One's program for handling consumer disputes.[1]

In my opinion, the policies and practices described by the Capital One employee will fail to result in adequate reinvestigations of many legitimate consumer disputes and will cause Capital One to "verify" information that is inaccurate, or is incomplete to the extent that it would need to be corrected and/or deleted from a consumer's credit report in order to ensure fairness. These policies and practices will contribute to inaccuracy throughout the credit reporting system, and will also heighten damage to consumers by increasing the amount of time they expend, and emotional distress they endure, attempting to correct inaccuracies. Allow me briefly to explain why.

---

**Evan Hendricks     P.O. Box 302     Cabin John, MD 20818**
(301) 229 7002  (301) 229 8011 [fax] evan@privacytimes.com

---

[1] The deposition of Pamela G. Tuskey was taken May 21, 2003 by Attorney Ian B. Lyngklip in the case, Carol Fleischer v. Trans Union, et al., Slip Op. No. 02-71301, U.S. District Court For The Eastern District of Michigan (Southern Division). To the best of my knowledge, the case was settled.

The first and most fundamental problem is that upon receiving a consumer dispute forwarded to it by a CRA, Capital One does not truly reinvestigate.[2] Instead, Capital One conducts a *comparison* of information about the consumer contained in the dispute form provided by the CRA,[3] with the information in its systems known as "Odyssey," "Beast," and "Unisys." As Capital One's Pamela G. Tuskey explained:

Mr. Lyngklip: What kinds of information do your ACDV operators have available to them through the interface of the Odyssey system?

Ms. Tuskey: Name, address, ECOA, pay history, cycle date, last date paid, statements, action or activity on the account, late fees, past-due fees, membership fees, etc.

Mr. Lyngklip: What about original application information?

Ms. Tuskey: That, we cannot see in Unisys.

Mr. Lyngklip: All right. Is there a reason why it is that your ACDV operators do not have access to all of the other systems that I mentioned, being Tandem, CHIA, Retain One, Casper, Baltrax, Amdahl, Capstone, and Rocky?

Ms. Tuskey: Yeah, I'll give you the simplified answer first. Based on what my associates do, which is to verify the information, the -- some of the systems that you mentioned there are for in-depth research; my associates do not complete in-depth research.

Mr. Lyngklip: Okay, why is it that your associates do not complete in-depth research?

Ms. Tuskey: They do that because, when the -- we had a representative from each bureau actually come to Capital One in -- I can verify this, I want to say it was like February of 2000. . . . A representative from each bureau came on three separate visits, so a Trans Union rep came, Experian rep, and then an Equifax rep. . . . And they came to explain to my team how to more properly and more accurately work accounts, the cases. One of the questions that I had for them, as a manager, was should we verify the accounts -- and I even explained to them what my definition of verify is -- which is, we pull up our system of record, in this case Unisys or Beast, we look at what the bureau has sent us on the ACDV. If there are any discrepancies, we make sure that what the bureau has mirrors exactly what we, as Capital One, have. That's verifying.

Mr. Lyngklip: That was what you described to the representatives as verifying?

Ms. Tuskey: Yes.

Mr. Lyngklip: And what did they say in response to that?

Ms. Tuskey: Well, I actually followed that up with, 'Do you want us to do that, or do you want us to do things such as pull statements, etc., actually do the research which would involve CHIA?' And in each case, the bureau rep said, No, we want you to verify it. We want you to make our system look like your system. So that's what we've been doing.

It is important that Capital One understand that the *comparison* it currently conducts after receiving a consumer dispute does not amount to an *investigation* and is insufficient in many

_____

[2] The *Webster's New Collegiate Dictionary* defines "investigate" as "to observe or study by close examination and systematic inquiry." One of the definitions of "systematic" is "marked by thoroughness and regularity." Similarly, www.dictionary.com defines it as "To make a detailed inquiry or systematic examination."

[3] The dispute form is known as an "ACDV," or Automated Consumer Dispute Verification

instances to determine whether a consumer's dispute is valid and whether information would need to be corrected. One such instance would be a mixed files case, in which two consumers' payment histories are merged together for credit reporting purposes because of a similarity in their names and/or SSNs. Although there are no authoritative numbers as to the extent of the mixed files problem, there is ample evidence that it is not uncommon. Another instance would be identity theft, which, in a sense, is a component of the mixed file category (since the activities of the fraudster are mixed into the credit history of the innocent victim). Another would be divorce.

To conduct an adequate reinvestigation, Capital One would need to take the appropriate *investigative* steps to learn if a consumer's dispute warranted a correction in the data it reported to CRAs. Naturally, the appropriate steps would depend on the circumstance. For starters, it needs to pay close attention to the nature of the dispute and all dispute-related information originally submitted by the consumer to Capital One or to the CRA. In some instances, Capital One might need to check archived material, like original credit applications or payment records. In other instances, it might need to check for similarities in names and/or SSNs that could cause a mixed file. In still others, it would need to know how to assist a customer who has become a victim of identity theft clear up a polluted history. Finally, in some cases, Capital One might be able to clear up an inaccuracy with a quick phone call.

A second concern regarding accuracy is the volume of consumer disputes and the time available to process them. Ms. Tuskey testified that Capital One handles approximately 4,000 disputes per day, and her team members were expected to process 30 disputes per hour. This leaves about two minutes per each dispute. In my opinion, this sort of production quota, which is governed by the ratio the number of handlers to the number of disputes, makes it difficult, if not impossible, for Capital One dispute handlers to adequately investigate consumers' legitimate disputes over inaccurate data in their credit reports. In my opinion, such a system pressures Capital One personnel into prioritizing the *quantity* of data processed over *data quality* (e.g., accuracy, truthfulness and completeness).

A third concern is the adequacy of training. It does not appear that Capital One's credit report specialists receive much in the way of formal training.

Mr. Lyngklip: How did you find out about the procedures and in terms of how they come to their decision, and how did you find out about the mechanics of the credit dispute process?

Ms. Tuskey: I found out the way any new associate would find out. I had side-by-side training. At the time that we're looking into here, we had no formal policies or procedures, no written documentation. It was really all on-the-job training, so I became familiar by sitting with a veteran associate as well as a quality associate just like everybody else. . . .

Mr. Lyngklip: This might sound like a silly question, and I don't mean to be flip at all, but who trained the first staff person? Do we know how those procedures were handed down and where they came from originally?

Ms. Tuskey: No. My guess, since everything had not been documented at all, my guess is it was just like oral history; you tell me and I'll tell the next person and the next person, and a lot of judgment calls going on.

Mr. Lyngklip: Now, that describes how the decision-making process is made in terms of whether or not a particular dispute will be resolved in favor of or against a consumer, what about

Mr. Lyngklip: Now, that describes how the decision-making process is made in terms of whether or not a particular dispute will be resolved in favor of or against a consumer, what about the mechanics of navigating the screens? Is that something that's written down in training manuals or guides?

Ms. Tuskey:  Now it is.

Mr. Lyngklip: Again, when was that implemented?

Ms. Tuskey:  Three weeks ago.

The issue of credit report accuracy, and the factors that can cause inaccuracy (i.e., mixed files, clerical errors, divorce, co-signer arrangements, identity theft), and the relevant standards under FCRA, can be complex. Accordingly, it is important that Capitol One personnel responsible for evaluating consumer disputes are adequately trained.

As Capitol One and the CRAs are well aware, Congress devoted a substantial portion of 2003 investigating and emphasizing the importance of fairness, accuracy and privacy in credit reporting. The process left no doubt that accuracy was important to consumers, and that inaccuracy potentially was very damaging on a number of fronts. It ultimately approved legislation to further advance these goals, paying particular attention to the important roles and duties of furnishers, like Capitol One, and the CRAs.

In his written testimony before a June 24 hearing before a House Financial Services subcommittee, Capital One Vice President Scott Hildebrand, "(I)t is an absurd argument that those who use the data as part of their credit granting process do not have a significant stake in the accuracy of the information provided on consumers. Put most simply, at Capital One, our models do not work if the information contained in the bureau reports is not accurate."

What Capital One must understand is that consumers, including Capital One customers, will not be able to benefit from the FCRA's accuracy mechanisms if MBNA continues its current practice of responding to a consumer dispute with a "two-dimensional" data comparison between the ACDV and its own databases. In my opinion, Capital One will continue to contribute to inaccuracy in the credit reporting system if it does not cure these defects and substantially revamp the current policies and practices addressed in this letter.

Accordingly, it is incumbent upon the CRAs to ensure that Capital One's customer dispute system meets appropriate standards and that the data Capital One reports to CRAs following a consumer dispute are reliable. If Capital One fails to cure the problems identified in this letter, then CRAs would be remiss in relying on Capital One's representations that it had "investigated" and "verified as accurate" data disputed by consumers.

I look forward to your response. Please do not hesitate to contact me if you have questions.

Sincerely Yours,

Evan Hendricks